# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 25, 2023 Session

## STATE OF TENNESSEE v. JOHN SHAFFIGHI

**Appeal from the Criminal Court for Knox County**
**No. 56097     G. Scott Green, Judge**

_____

**No. E2022-00525-CCA-R3-CD**

_____

A Knox County jury found the Defendant, John Shaffighi, guilty of aggravated rape and aggravated sexual battery from events occurring in 1992. He was sentenced to an effective term of twenty-five years. On appeal, the Defendant challenges the legal sufficiency of the evidence supporting his convictions. He also asserts the trial court erred by (1) denying a motion to dismiss in light of missing evidence; (2) allowing the victim's forensic interview to be played at trial; (3) denying his motion for a mistrial after testimony from the victim; (4) limiting the testimony of his expert witness; (5) instructing the jury on its deliberation during its deadlock; and (6) imposing the maximum sentence after misapplying enhancement factors and failing to apply mitigating factors. The State concedes that the Defendant was not sentenced properly under the pre-2005 sentencing statutes. Upon our review, we affirm the Defendant's convictions but respectfully remand the case for resentencing in accordance with *Blakely v. Washington*, 542 U.S. 296 (2004).

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed in Part, Reversed in Part;**
**Case Remanded**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

Gregory P. Isaacs (on appeal and at trial), Franklin Ammons (at trial), and Ashlee B. Mathis (at *Ferguson* hearing), Knoxville, Tennessee, for the appellant, John Shaffighi.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Nathaniel R. Ogle, Joanie Stewart, and Leland Price, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

# FACTUAL BACKGROUND

On August 9, 1994, the Defendant was charged by presentment with one count of aggravated rape and one count of aggravated sexual battery. The victim of both offenses was a child who was less than thirteen years old at the time of the offenses. After being charged, the Defendant left the country. Almost two decades later, the Defendant was apprehended and transported to Knox County to face the charges against him. The trial began on November 8, 2021.

## A.    STATE'S PROOF

The victim, whose birthday was June 19, 1981, was forty years old at the time of trial. When she was ten, she lived with her father, stepmother, and younger siblings on Middlebrook Pike in Knox County.

In October 1991, she began taking group classes a few days a week at the Defendant's karate studio. The victim performed well in the classes and was scheduled to participate in the Junior Olympics in July 1992. In January 1992, the Defendant offered her extra lessons to prepare for that competition. The victim's father agreed to the extra lessons, but he was unaware that the Defendant and the victim would be alone together.

The victim was initially excited to take classes from the Defendant and "looked for his approval . . . almost like a father figure." However, after the private lessons began, he started asking her to sit on his lap in his office or rubbing "the outside of [her] legs and into the inside of [her] legs and moan[ing.]" No one else was in the building when he touched her. When she sat on his lap, her back was "to his chest, and he would rub on the outside of [her] legs and then rub towards the inner of [her] thigh. And [she] could feel what [she] thought was his lower private part underneath [her]." The victim estimated that she sat on the Defendant's lap "five or six times."

After the victim told the Defendant she no longer wanted to sit on his lap, the Defendant stopped but told her she "still had to do the fruit" as part of the extra sessions. The Defendant told her that instead of working on forms or sparring, he had something that would make her "better and stronger and make [her] hyper, and it would give [her] more energy for class."

She explained that when they got to the studio for the private lessons, the Defendant made her sit on a cinderblock on the edge of a karate mat. The Defendant tightly blindfolded her with "his shirt or something," and the studio lights were off. She heard

him walk across the mat to and from his office "with his pants at his feet." Then, he inserted the fruit inside her mouth and instructed her to "suck it" but not to chew or bite it. He encouraged her to "take more in" as he drew the fruit in and out of her mouth and made noises. Initially, her mouth was dry, and she gagged. Eventually, "stuff" came out of the fruit that the Defendant explained was "juice" she needed to swallow. Afterward, the Defendant left her sitting blindfolded on the cinderblock while he returned to his office to "put the fruit up." As a child, the victim thought it was real fruit. As an adult, however, she realized that it was his penis.

The victim recalled that occasionally, instead of going straight to the studio after picking her up, the Defendant stopped at his apartment across the street from the studio. The Defendant insisted that the victim accompany him inside. The Defendant told her he could make her muscles stronger by "put[ting] some of the juices on the back of [her] legs." The Defendant blindfolded the victim. At the Defendant's request, she removed her pants but not her underwear so the Defendant could rub the fruit juice on her legs. She stood on the couch with her "legs on the tip of the couch and ben[t] over and h[e]ld the back of the couch." The victim kept her legs together, and the Defendant pushed the fruit between her legs and breathed heavily. In the end, the Defendant wiped the juice off her legs, which the victim found odd because it was supposed to strengthen her muscles.

The fruit the Defendant rubbed on the back of the victim's legs felt the same shape as the fruit he put in her mouth. After she became an adult, the victim realized the Defendant had been rubbing his penis on her legs. The victim estimated that the Defendant rubbed juice on her legs five times. The victim said the fruit incidents occurred "about fifteen times."

The victim was afraid of the Defendant because he was a "very strict teacher, and [she] knew [she] wasn't supposed to say anything." After the fruit incidents, the Defendant was in a "[g]ood mood all day." He once told her, "[D]on't tell anybody about this because I'll know." She purposefully missed classes and car rides with the Defendant because she felt she could not refuse him.

The victim's father noticed a decline in her attitude and grades after she started extra lessons. He threatened to take away her activities, including karate, if she did not improve. In the fall of 1992, the Defendant relocated to a larger karate studio, and the victim's family also moved across town to Fountain City. As a result, the victim's father removed her from the karate classes, and she hid her excitement about quitting because she did not "want [her] dad to ask questions."

After moving to Fountain City, the victim told a friend about "sitting on [the Defendant's] lap." The victim did not realize she had told her friend about "something bad." However, her friend "freaked out" and advised the victim to talk to her parents. Around November 1992, the victim told her stepmother about sitting on the Defendant's lap. Her stepmother "was completely shocked."

- 3 -

The victim's stepmother contacted the authorities, and Tammy Mathes Judd with the Department of Children's Services ("DCS") forensically interviewed the victim on November 17, 1992. The interview was recorded, and the recording was played for the jury. The interview was the first time the victim revealed everything the Defendant had done. The victim said she had no "sexual knowledge" and had "[n]o sex talks with [her] parents" at that age.

On February 8, 1993, Ms. Mathes Judd and Investigator Ron Humphrey interviewed the Defendant at the Knoxville Police Department. The Defendant had no apparent trouble understanding the waiver of rights form, the questions being asked, or the meaning of the interview. The Defendant acknowledged he knew the victim from karate lessons, but he denied the allegations against him.

During the interview, the Defendant initially denied that the victim had been to his apartment. However, he eventually conceded "that sometimes the students would sit in the car. Then it was like maybe at the—stand at the steps, and then it went all the way to being at the hallway with the door open to his apartment." However, the Defendant never admitted to taking the victim into his apartment.

## B.    DEFENDANT'S PROOF

The Defendant presented the testimony of Dr. Deryn Mary Strange, a cognitive psychologist. Dr. Strange testified without objection as an expert in the "field of human memory and its effects." She explained that a memory was not permanent. Instead, it was "a three-step process" of encoding, storage, and retrieval. She explained that memory was a "reconstructive phenomenon." A memory could be imperfect because it had to be assembled from several neuro pathways, and it could be altered by storing additional "information [that] came after the event." In other words, "sometimes we can record things that we didn't actually experience, and that storage and retrieval phase of memory is an ongoing loop. So every time we activate the memory again, it gets restored."

Dr. Strange said that children were more susceptible to suggestion than adults and that this case had several factors that could produce distorted memories. She explained that to perform a "good interview" of a "young child," the interviewer first had to establish a good rapport with the child. Then, the interviewer needed to verify that the child knew the difference between truth and lies and to ensure the child knew "I don't know" was a valid answer to a question. The interviewer also needed to ensure the child knew she could correct the interviewer if the interviewer got facts wrong or misunderstood something. Dr. Strange said it was important for an interviewer to ask open-ended questions and to avoid asking leading questions that could distort memories.

Dr. Strange agreed that the current protocols that ensure the accuracy of child interviews were starting to be implemented in 1992. However, she believed that the protocols were "not at all present" during the victim's interview. Notably, the recording of the interview reflected that the victim and Ms. Mathes Judd had spoken before the recording began, and Dr. Strange found the failure to start the recording at the beginning of the conversation to be inappropriate.

During the interview, Ms. Mathes Judd interrupted the victim and asked leading and composite questions that were not appropriate for the victim's "developmental stage." Dr. Strange could not recall whether Ms. Mathes Judd asked any open-ended questions but opined that "there were numerous suggestive influences present in this case." After Dr. Strange's testimony, the defense rested.

## C.    VERDICT, SENTENCING, AND APPEAL

The jury found the Defendant guilty of aggravated rape and aggravated sexual battery. The trial court sentenced the Defendant as a Range I, standard offender to concurrent sentences of twenty-five years for the aggravated rape conviction and twelve years for the aggravated sexual battery conviction, for an effective sentence of twenty-five years. The trial court denied the Defendant's motion for a new trial on April 21, 2022, and the Defendant filed a timely notice of appeal on April 27, 2022.

## ANALYSIS

On appeal, the Defendant challenges the legal sufficiency of the evidence supporting his convictions for rape of a child and aggravated sexual battery. He also asserts that the trial court erred by (1) denying a motion to dismiss in light of missing evidence; (2) allowing the victim's forensic interview to be played at trial; (3) denying his motion for a mistrial after testimony from the victim; (4) limiting the testimony of his expert witness; (5) instructing the jury on its deliberation during its deadlock; and (6) imposing the maximum sentence after misapplying enhancement factors and failing to apply mitigating factors. We address each of these issues in turn.

## A.    LEGAL SUFFICIENCY OF THE EVIDENCE

The Defendant first challenges the legal sufficiency of the evidence supporting his convictions. "The standard for appellate review of a claim challenging the sufficiency of the State's evidence is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Miller*, 638 S.W.3d 136, 157 (Tenn. 2021)

(quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This standard of review is "highly deferential" in favor of the jury's verdict. *See State v. Lyons*, 669 S.W.3d 775, 791 (Tenn. 2023). Indeed, this standard requires us to resolve all conflicts in favor of the State's theory and to view the credited testimony in a light most favorable to the State. *State v. McKinney*, 669 S.W.3d 753, 772 (Tenn. 2023). To that end, "[w]e do not reweigh the evidence, because questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence are resolved by the jury, as the trier of fact." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (citations omitted). "The standard of review is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (internal quotation marks and citation omitted).

On appeal, the Defendant argues that the proof failed to show that he either penetrated the victim or had unlawful sexual contact with the victim. He asserts he was convicted "without a scintilla of physical evidence or corroboration by witnesses." To support his argument, the Defendant emphasized that the protocols for ensuring the accuracy of child forensic interviews were not present in this case. He also maintains the victim's testimony was "riddled with inconsistencies" and criticizes the investigation conducted by the Knoxville Police Department.

In response, the State argues that the proof presented at trial was "more than sufficient to sustain his convictions." It also argues that the victim's testimony was sufficient proof to establish the elements of the charged offenses and that corroboration of her testimony was not required. We agree with the State.

### 1.      Aggravated Rape

As charged in this case, the offense of aggravated rape required the State to prove that the Defendant unlawfully sexually penetrated the victim by placing his penis inside her mouth when she was less than thirteen years old. Tenn. Code Ann. §§ 39-13-502(a)(4), -501(7) (1991 Repl.). Specifically, the trial court charged the jury that the State elected:

> An act of fellatio at a time between January of 1992 and August of 1992, while [the Defendant] had [the victim], a child under the age of thirteen (13) years old, alone at the karate studio, wherein [the Defendant] covered [the victim's] eyes, had her sit on a cinderblock, and placed his penis, that he called "fruit," into her mouth, told her to not bite it, moaned, and then had her suck on it until what he called "the juice" came out which he told her to swallow.

In the light most favorable to the State, the proof at trial established that when the victim was ten years old, she began taking lessons at the Defendant's karate studio.

Sometime after January 1992, but before the victim participated in the Junior Olympics in July 1992, the Defendant convinced the victim to take extra lessons. The Defendant told her he had something to make her "stronger" and "hyper" and give her more energy. While alone at the studio, he made her sit blindfolded on a cinderblock on the edge of a karate mat. She heard him walk to his office with his pants around his feet to get the fruit. As an adult, she realized the fruit was his penis. When he returned to her, he put his penis inside her mouth and instructed her not to "bite" or "chew" but to "suck it." He made noises while he moved his penis in and out of her mouth and urged her to "take more in[.]"

The Defendant told her to swallow the "juice" that came out of his penis. The victim did not like the incidents with the fruit but did not realize anything bad was happening until she spoke with her friend, who encouraged her to tell her parents. After telling her parents, the abuse was reported to the authorities. After the Defendant was charged with his sexual abuse of the victim, he fled from the jurisdiction and did not return for more than two decades. These facts established the essential elements of aggravated rape.

The Defendant complains that the victim's testimony was the only evidence against him. He also argues that the State's investigation of the case was inadequate, that Dr. Strange testified that the 1992 forensic interview could have compromised the victim's memories of the events, and that the victim reviewed the forensic interview before her testimony.

In essence, the Defendant's argument is an invitation to reweigh the evidence or to disturb the jury's determinations on appeal. We respectfully decline to do so, particularly in light of the standard of appellate review. When we review the legal sufficiency of the convicting evidence, the law requires us to look at all the evidence and to accredit the testimony of the State's witnesses when doing so. *Shackleford*, 673 S.W.3d at 250. This standard is intentionally deferential, as it seeks to "impinge[ ] upon 'jury' discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Jackson*, 443 U.S. at 319.

Thus, in looking at the victim's testimony in this case, we take her testimony as being true to give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* In so doing, we observe that "it is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction." *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) (citation and internal quotation marks omitted). Indeed, the victim's testimony requires no corroboration to sustain a conviction. *State v. Collier*, 411 S.W.3d 886, 899 (Tenn. 2013) ("[I]t has long been the rule in our state that the uncorroborated testimony of a minor victim may be sufficient to sustain a conviction for forcible or coercive sex offenses such as simple rape."). As such, it is not part of our role, properly conceived, to "reevaluate the credibility of the witnesses or to revisit inconsistencies in the testimony[,]" should there be any. *State v. Murray*, No.

M2021-00688-CCA-R3-CD, 2022 WL 17336522, at *5 (Tenn. Crim. App. Nov. 30, 2022), *perm. app. denied* (Tenn. Mar. 8, 2023). We conclude that the evidence was legally sufficient to sustain the Defendant's conviction of aggravated rape.

### 2. Aggravated Sexual Battery

As charged in this case, the offense of aggravated sexual battery required the State to prove that the Defendant had unlawful sexual contact with the victim when the victim was less than thirteen years old. Tenn. Code Ann. §§ 39-13-504, -502(a) (1991 Repl.). Sexual contact is defined as "[t]he intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6) (1991 Repl.). Intimate parts are defined as "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" *Id.* § 39-13-501(2). Specifically, the trial court charged the jury that the State elected:

> at a time between January of 1992 and August of 1992, while [the Defendant] had [the victim], a child under the age of thirteen (13) years old, alone at his apartment, when [the Defendant] told [the victim] to lean over the couch with her pants removed and her eyes covered, while he rubbed what he called "the fruit" on her inner thighs while moaning until what he called "the juice" went on her legs and then he wiped it off.

In the light most favorable to the State, the proof established that while the ten-year-old victim was taking extra lessons, the Defendant occasionally picked her up from her grandparents' home after school. Although he was supposed to take her to the karate studio, he took her to his apartment on approximately five occasions. On one occasion, he told her he could strengthen her muscles by putting juice on the back of her legs. He blindfolded her and told her to remove her pants, stand on the couch, bend over, and hold the back of the couch. He rubbed his penis up and down the inside of her thighs and pushed it between her legs. He began breathing heavily, and "[t]here would be juice at the end," which the Defendant wiped off her legs. These facts established the essential elements of aggravated sexual battery.

The Defendant again asserts that he cannot be convicted on the victim's uncorroborated testimony, especially considering the inadequacy of the State's investigation, the contamination of the victim's 1992 forensic interview, and the victim's faulty memory. However, as we stated earlier, the standard of appellate review requires us to look at all the evidence and to accredit the testimony of the State's witnesses when doing so. We conclude that the evidence was legally sufficient to sustain the Defendant's conviction of aggravated sexual battery.

## B. *FERGUSON* MOTION

The Defendant next argues that the trial court erred in not dismissing the charges against him due to the State's failure to preserve the polygraph or the audio recording of his 1993 interview with police in violation of *State v. Ferguson*, 2 S.W.3d 912 (Tenn. 1999). The State responds that the Defendant failed to show that the polygraph evidence ever existed and that he had a transcript of the 1993 interview. It also argues that the trial was not fundamentally unfair even without this evidence. We agree with the State.

### 1. Background

As background for this issue, the Defendant sought dismissal of this case before trial, arguing that the State lost crucial evidence. In particular, he argued that the State's failure to preserve a 1993 polygraph examination and an audio recording of an interview he gave at the same time hampered his defense and violated the State's duty to preserve evidence. The Defendant asserted that although a transcript of the interview was preserved, it was an inadequate substitute for the audio recording because he believed that the transcript did not capture additional conversations that occurred during this interview.

In response, the State asserted that it could find no evidence that a polygraph examination was offered or administered to the Defendant, and it submitted an affidavit from Investigator Humphrey attesting to this fact. It also stated that it searched for, but could not locate, the audio recordings from the 1993 interview.

Following a hearing, the trial court found that although the Defendant voluntarily made a statement in 1993, the Defendant also voluntarily left the jurisdiction and stayed away for twenty-three years. The court said:

> [T]here's no way this Court is going to allow the defendant to benefit from a misfortune that he created for himself simply by leaving the jurisdiction and staying gone for so long. He is the reason there's been such a delay. He is the reason evidence had [a] chance to get lost or destroyed. And he will not benefit from it.

Regarding the audio recording, the trial court found that the transcript gave "some idea of what was on it," but also concluded that the audio statement would be inadmissible hearsay if offered by the Defendant. As such, the court denied the motion.

## 2. Duty to Preserve Evidence

On appeal, the Defendant challenges the trial court's refusal to dismiss the charges against him due to the State's failure to preserve the polygraph or the audio recording of his 1993 interview with police in violation of *Ferguson*. "Every criminal defendant is guaranteed the right to a fair trial under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the 'Law of the Land' Clause of Article I, section 8 of the Tennessee Constitution." *Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). "To facilitate this right, a defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to guilt or relevant to punishment." *Ferguson*, 2 S.W.3d at 915; *see Brady v. Maryland*, 373 U.S. 83, 87 (1963).

In *Ferguson*, our supreme court addressed "the factors [that] should guide the determination of the consequences that flow from the State's loss or destruction of evidence which the accused contends would be exculpatory." *Ferguson*, 2 S.W.3d at 914. First, a reviewing court must determine whether the State had a duty to preserve the lost or destroyed evidence. *Id.* at 917. "For this duty to arise, the [evidence] must be expected to play a significant role in [the Defendant's] defense." *State v. Merriman*, 410 S.W.3d 779, 792 (Tenn. 2013). "Specifically, [the evidence] must have potential exculpatory value and be of such a nature that [the Defendant] would be unable to obtain comparable evidence by other reasonably available means." *Id.*; *State v. Crass*, 660 S.W.3d 506, 513 (Tenn. Crim. App. 2022).

"If the proof demonstrates the existence of a duty to preserve and further shows that the State has failed in that duty, the analysis moves to a consideration of several factors which should guide the decision regarding the consequences of the breach." *Ferguson*, 2 S.W.3d at 917. These factors are:

1.  The degree of negligence involved;

2.  The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

3.  The sufficiency of the other evidence used at trial to support the conviction.

*Id.* (footnote omitted). If, after considering these factors, the trial court believes that a trial without the missing evidence would lack fundamental fairness, it may consider several remedies, such as dismissing the charges or providing an appropriate jury instruction. *Id.* This Court reviews a trial court's decision concerning the fundamental fairness of the trial

under a de novo standard. *Merriman*, 410 S.W.3d at 790. However, we review the trial court's remedy under an abuse of discretion standard. *Id.*; *Crass*, 660 S.W.3d at 514.

### a.  Polygraph

With respect to the Defendant's argument that the State should have preserved the 1993 polygraph examination, he has not shown that any such examination occurred in the first instance. In the lower court, the only proof that the Defendant submitted regarding the existence of the polygraph was his affidavit, which was attached as an exhibit to his first motion to dismiss. In response, the State submitted the affidavit of Investigator Humphrey, which asserted that the Defendant had never been offered a polygraph and that one was not administered. Additionally, the Defendant acknowledged that the police were unable to find any evidence that a polygraph had been administered, and he makes no argument regarding this point in his appellate brief.

The burden is on the Defendant to show that evidence alleged to have been lost or destroyed by the State actually existed. *See State v. Martin*, No. W2017-01610-CCA-R3-CD, 2018 WL 4677575, at *16 (Tenn. Crim. App. Sept. 28, 2018) (denying *Ferguson* relief when "the Defendant failed to prove that a second a lineup ever existed"), *no perm. app. filed*. *Ferguson* simply does not apply to evidence that never existed. "On the contrary, this court has repeatedly refused to grant *Ferguson* relief when there was no proof that the alleged evidence existed." *State v. Sparks*, No. M2005-02436-CCA-R3-CD, 2006 WL 2242236, at *5 (Tenn. Crim. App. Aug. 4, 2006) (citing cases), *no perm. app. filed*; *State v. Morton*, No. E2019-01755-CCA-R3-CD, 2022 WL 2301439, at *33 (Tenn. Crim. App. June 27, 2022), *perm. app. denied* (Tenn. Nov. 16, 2022).

In this case, the trial court accredited the State's proof and found that the Defendant failed to show that the polygraph existed. On our de novo review of the record as a whole, we agree. *See Merriman*, 410 S.W.3d at 797 (recognizing that in conducting the de novo review, "[d]eference should be given to the trial court's findings of fact . . . unless the evidence preponderates otherwise."). Because he failed to show that the polygraph existed, the Defendant is not entitled to relief.

### b.  Audio Recording of Interview

Unlike the polygraph, the parties agree that the Defendant gave an interview to law enforcement in 1993 and that the interview was audio recorded. Because the recorded statements of the accused are discoverable, the State had a duty to preserve this evidence. *See* Tenn. R. Crim. P. 16(a)(1)(B); *Merriman*, 410 S.W.3d at 785 ("In *Ferguson*, we acknowledged the State's general duty to preserve all evidence subject to discovery and

inspection under Rule 16 of the Tennessee Rules of Criminal Procedure[.]" (citing *Ferguson*, 2 S.W.3d at 917)).

Our supreme court also recognized, however, that "the State's duty to preserve evidence is limited to constitutionally material evidence described as 'evidence that might be expected to play a significant role in the suspect's defense.'" *Merriman*, 410 S.W.3d at 785 (quoting *Ferguson*, 2 S.W.3d at 917). In *Merriman*, the supreme court held that to meet this materiality standard, "the evidence must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* (citing *Ferguson*, 2 S.W.3d at 918-19).

From the Defendant's affidavit and his description of the interview, we doubt that the missing audio recording possessed any potentially exculpatory value apart from his own self-serving statements. Nevertheless, for the sake of analysis here, we presume that the State had a duty to preserve the Defendant's recorded statements.

Turning then to the *Ferguson* considerations, the first factor is the degree of negligence involved in the State's failure to preserve the evidence. *Ferguson*, 2 S.W.3d at 917. In *Ferguson*, our supreme court recognized that when potentially exculpatory evidence is lost or destroyed, negligence by the State is presumed. *Id.* at 917, n.10. In this case, the trial court found that the audio recording was lost due to the passage of time, which was itself due to the Defendant's absconding from the jurisdiction, and that no "deliberate action" existed on the State's part. We agree. Nothing in the record supports a finding that the State's failure to preserve the audio recording was anything more than simple negligence.

The second factor considers the significance of the destroyed evidence and the reliability of available secondary or substitute evidence. *Id.* at 917. The Defendant contends that the lost audio recording was material because it consisted of statements he voluntarily made after he waived his *Miranda* rights and that these statements highlighted his cooperation and assertion of innocence. He also claims that the evidence had significant probative value and that no reliable substitute evidence exists. We respectfully disagree.

In his affidavit supporting his motion to dismiss, the Defendant stated that he met with two investigators and that they discussed his "general information, [his] travels, and [his] taekwondo school" before the investigators started recording the interview. The recorded part of the interview was transcribed, and the Defendant possessed this transcription at trial. The Defendant does not identify any portion of the recorded interview that was not transcribed, nor does he assert that any "unintelligible" portions reflected in the transcript omitted material or exculpatory information. On the contrary, he specifically acknowledged "that the general material in the transcript of my interview is accurate as to the topical content of our conversation that was recorded."

- 12 -

We conclude that there was little significance to the missing audio, particularly in light of its minimal probative value and availability of other evidence. The Defendant argues that the principal importance of the audio recording was to show his cooperation and assertion of innocence. However, other substitute evidence existed to establish those objects fully, including the interview transcript itself, the Defendant's written waiver of his *Miranda* rights, and his cross-examination of Ms. Mathes Judd about the circumstances of his police interview. *See State v. McDaniel*, No. E2019-01862-CCA-R3-CD, 2022 WL 558283, at *13 (Tenn. Crim. App. Feb. 24, 2022), *no perm. app. filed*; *State v. Sherrill*, No. M2017-00643-CCA-R3-CD, 2018 WL 5877295, at *19 (Tenn. Crim. App. Nov. 8, 2018), *no perm. app. filed*. The second *Ferguson* factor does not weigh in favor of any remedy.

Finally, the other evidence introduced at trial, including the victim's testimony, was more than sufficient to support the Defendant's convictions because it established the essential elements of the conviction offenses and identified the Defendant as the perpetrator. As such, we conclude that the trial was not fundamentally unfair without the audio recording. The Defendant is not entitled to relief.

## C.    PRIOR CONSISTENT STATEMENT

The Defendant next challenges the trial court's decision to admit the audio recording of the victim's 1992 forensic interview as a prior consistent statement. The Defendant asserts that the interview does not qualify as a prior consistent statement and argues that its admission deprived him of a fair trial.

As background for this issue, we note that the Defendant highlighted inconsistencies in the victim's recollections during cross-examination, suggesting she could only recall events after listening to the interview recording. The State argued that this line of questioning by the defense, which implied faulty recollection, justified introducing the interview as a prior consistent statement to demonstrate the victim's consistent account of events closer to the time they happened. The trial court agreed with the State and allowed the interview to be admitted into evidence for those reasons.

The Defendant's principal issue with the court's admission of the interview is that the trial court erred in "determining that any exceptions for the admission of prior consistent statements were present" in the case. Typically, we review questions involving the admission of a prior consistent statement for an abuse of discretion. *See State v. Tizard*, 897 S.W.2d 732, 747 (Tenn. Crim. App. 1994).

"The Tennessee Rules of Evidence do not specifically cover rehabilitation of impeached witnesses, but Tennessee law is well-established." Neil P. Cohen et al., *Tennessee Law of Evidence*, § 8.05[5], n.170 (6th ed. 2011). A witness's prior consistent

- 13 -

statements "are generally not admissible to bolster the testimony of a witness." *State v. Herron*, 461 S.W.3d 890, 904-05 (Tenn. 2015). "However, when a defendant attacks a witness's credibility, the State may rehabilitate the witness by offering evidence of a prior consistent statement." *State v. Rimmer*, 623 S.W.3d 235, 284 (Tenn. 2021) (appendix), *reh'g denied* (May 21, 2021), *cert. denied*, 142 S. Ct. 790 (2022). As such, "[a]dmission of prior consistent statements is authorized in two circumstances: (1) where the statement is offered to rebut the implication that the witness's testimony was a recent fabrication; and (2) when deliberate falsehood has been implied." *Id.*; *State v. Inlow*, 52 S.W.3d 101, 106 (Tenn. Crim. App. 2000).

Notably, a prior consistent statement may be admitted "only when the witness's testimony has been assailed or seriously questioned to the extent that the witness'[s] credibility needs shoring up." *Herron*, 461 S.W.3d at 905 (citation and internal quotation marks omitted). In other words, "if the witness is impeached by [a] suggestion of faulty recollection, it would be relevant to prove that the witness made a consistent statement soon after the event when the matter was fresher in the witness' memory." *Tizard*, 897 S.W.2d at 746.

In the instant case, defense counsel's cross-examination was entirely concerned with whether the victim's recollections were accurate, and he repeatedly questioned whether they were faulty or fabricated. This type of attack on the victim's credibility laid the foundation for the State to use the victim's prior consistent statements to rehabilitate her testimony. *See Herron*, 461 S.W.3d 905. The Defendant does not argue that the admission of the interview exceeded what was necessary to rehabilitate the witness. *State v. Sherrod*, No. W2015-02022-CCA-R3-CD, 2017 WL 1907723, at *11 (Tenn. Crim. App. May 9, 2017), *perm. app. denied* (Tenn. Sept. 22, 2017). Nor does he argue that the court's instructions to the jury on using these statements were deficient or improper. As such, we conclude that the trial court acted within its discretion in admitting the audio recording of the victim's forensic interview as a prior consistent statement.

### D.   MOTION FOR MISTRIAL

The Defendant next argues that the trial court erred in denying his motion for mistrial after the victim twice infringed on his privilege against self-incrimination during her trial testimony. As background for this issue, defense counsel repeatedly asked the victim on cross-examination if anyone witnessed the molestation, especially in the busy karate studio. The victim consistently responded that she and the Defendant were the only people present when the molestation occurred. At that point, the following discussion ensued:

- 14 -

| | |
|---|---|
| [Trial Counsel:] | So let's get this straight. If [the Defendant] picked you up from school and gave a private lesson before everything started, are you saying that the doors were locked, or how can no one get in to see you in a private office or room with [the Defendant] if that happened? |
| [The victim:] | You'd have to ask [the Defendant] that because I know I was there by myself. |

Defense counsel did not object to the victim's response as being somehow improper in any way. Instead, he continued to press the victim about how no one else could have witnessed the molestation. Finally, the following discussion occurred:

| | |
|---|---|
| [Trial Counsel:] | -- again, over 11 months and 20 times, just name one person that can tell us that they saw it happen. They saw you leave or exit – |
| [The victim:] | [The Defendant]. |

After this response from the victim, defense counsel moved for a mistrial, arguing that the victim had twice impermissibly commented upon the Defendant's Fifth Amendment right not to incriminate himself. The trial court observed, "You can't have it both ways. You can't ask these broad, open-ended questions and then complain when she answers them." Defense counsel did not request another remedy, such as a curative instruction.

On appeal, the Defendant argues that the trial court should have granted a mistrial because the victim's statements were impermissible commentary on the Defendant's Fifth Amendment privilege against self-incrimination. A mistrial should be declared only when a manifest necessity exists for such an action. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). "A manifest necessity exists when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial were not declared, and there is 'no feasible alternative to halting the proceedings.'" *State v. Pratt*, No. M2017-01317-CCA-R3-CD, 2018 WL 4005390, at *4 (Tenn. Crim. App. Aug. 20, 2018) (quoting *State v. Land*, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)), *no perm. app. filed*. Stated differently, if there is a feasible and just remedy other than halting the proceedings, no manifest necessity exists for a mistrial. *See State v. Smith*, 871 S.W.2d 667, 673 (Tenn. 1994).

While "[t]he party seeking a mistrial has the burden of establishing its necessity," the "decision whether to grant a mistrial lies within the discretion of the trial court." *State v. Jones*, 568 S.W.3d 101, 126 (Tenn. 2019). An abuse of discretion "occurs when the trial court 'applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party.'" *State v. Johnson*, 401 S.W.3d 1, 21 (Tenn. 2013) (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)).

As we have recognized, "Tennessee courts do not apply 'any exacting standard' for determining when a mistrial is necessary after a witness has injected improper testimony[.]" *State v. Horn*, No. E2015-00715-CCA-R3-CD, 2016 WL 561181, at *7 (Tenn. Crim. App. Feb. 12, 2016), *no perm. app. filed*. However, a mistrial was not warranted in this case because the witness did not testify improperly.

Context is important. In response to repeated questioning by defense counsel, the victim testified that she and the Defendant were the only people present when the molestation occurred. When pressed further to identify people who could corroborate her testimony, the victim answered, somewhat obviously, that the Defendant could do so. This answer, which was given in direct response to the Defendant's repeated questions, merely restated the victim's earlier testimony: that the Defendant molested her only when they were alone.

In support of his argument on appeal, the Defendant cites *State v. Jackson*, 444 S.W.3d 554 (Tenn. 2014) as justifying a mistrial. This case, however, offers no relief because it concerned whether *the State* impermissibly commented on a defendant's right to remain silent during the closing argument. *Jackson*, 444 S.W.3d at 588. In contrast, not only was the victim's testimony a restatement that the Defendant molested her only when they were alone—and thus not a comment on the Defendant's right to remain silent—the victim gave this testimony in direct response to the questions asked by defense counsel during cross-examination. *See State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). Accordingly, we conclude that the trial court acted within its discretion in denying the Defendant's motion for a mistrial.

### E.    DEFENSE EXPERT'S TESTIMONY

#### 1.    Background

On appeal, the Defendant contends that the trial court erred in limiting the testimony of Dr. Deryn Strange, an expert in memory and forensic interrogations. As background for this issue, the State filed a pretrial motion to exclude or limit Dr. Strange's testimony. In

particular, the State questioned the relevance and reliability of the testimony and argued that the testimony could infringe upon the jury's role. Tenn. R. Evid. 702.

The court held a pretrial hearing on the State's motion on August 24, 2020. In this hearing, Dr. Strange testified that she earned a Ph.D. in psychology and had been employed with the John Jay College of Criminal Justice since 2008. She also said that she had more than fifty publications "in terms of peer-reviewed . . . research" and that she had testified over fifty times "under the banner of memory errors."

Consistent with her later trial testimony, Dr. Strange testified about memory formation and the risks of false memories, particularly in children. She critiqued the 1992 forensic interview of the victim because the interviewer did not build rapport with the victim, used leading questions, and failed to record the interview.

Defense counsel asked Dr. Strange, "So based on your review and your knowledge and experience of this forensic interview, do you have an opinion as to whether this would have created a distorted memory?" She responded, "I can't say for sure, but I would be highly surprised if it didn't." Although Dr. Strange said that she could not offer an opinion to a reasonable degree of "psychological certainty"—she stated that "[p]sychological certainty isn't really a thing"— she did confirm that her opinions were being offered within a reasonable degree of scientific certainty.

In a written order, the trial court found that Dr. Strange was properly qualified as an expert in memory and forensic interrogations, and it allowed her to testify about her qualifications, how human memory works, and her perceived deficiencies in the 1992 forensic interview. However, the trial court found that because Dr. Strange was "unable to opine within a reasonable degree of certainty within her field of expertise, she may not offer an opinion as to whether or not a 'false memory' exists in this case."

At trial, Dr. Strange offered her expert experience and opinions on how human memory works and how to properly conduct a forensic interview to avoid distorting a victim's memory. She also opined "that there were numerous suggestive influences present" with the forensic interview in this case. She further agreed that the victim's memory could have been influenced by others with whom she spoke, including her parents. Finally, she confirmed that "we can never say how much suggestion there was, but we can see here significant sources of suggestion" in the interview.

In addition, Dr. Strange's expert report was admitted as an exhibit. In her report, Dr. Strange opined that "some of the factors we know can produce distorted memories were present in this case." She also explained, however, that it was "impossible to judge the degree of suggestion" in this particular case:

It is important to note that the entire interview with the complainant is not audio-recorded[,] and since there is no video[,] we miss a lot of detail. Also, by the time the child is interviewed by police[,] she has already participated in other interviews with, at the very least, her parents. Together that means it is impossible to judge the degree of suggestion. Nonetheless, what we are able to hear/read is a highly suggestive interview.

On appeal, the Defendant contends that the trial court excluded Dr. Strange's testimony because it could not be offered "within a reasonable degree of certainty within her field of expertise." Taking issue with this conclusion, he argues that the decision was a "restriction on the ultimate issue [that] substantially limited Dr. Strange's testimony." He further asserts that her complete opinion would have materially assisted the jury in assessing the credibility of the victim's initial statement and trial testimony. We respectfully disagree.

## 2.     Admissibility of Dr. Strange's Testimony

"The trial court possesses the sound discretion to determine the admissibility of evidence, and we review a trial court's denial of a motion *in limine* to restrict the admission of evidence under an abuse of discretion standard." *State v. Cannon*, 642 S.W.3d 401, 437 (Tenn. Crim. App. 2021). A trial court's decision regarding the "'admissibility, qualifications, relevancy and competency of expert testimony'" is subject to review under an abuse of discretion standard. *State v. Watkins*, 648 S.W.3d 235, 260 (Tenn. Crim. App. 2021) (quoting *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997)).

Our supreme court has emphasized that "[d]iscretionary decisions must take the applicable law and relevant facts into account." *Konvalinka v. Chattanooga-Hamilton Cnty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008). To that end, "an abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019) (citation and internal quotation marks omitted). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Moore v. Lee*, 644 S.W.3d 59, 63 (Tenn. 2022) (citation and internal quotation marks omitted).

Tennessee Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise."

Tennessee Rule of Evidence 703 curtails Rule 702 by providing that "[t]he court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness."

It is true that "there is no requirement that specific words be recited in order for expert testimony to be admissible," and expert testimony is not inadmissible simply because the expert does not expressly offer an opinion within a reasonable degree of scientific certainty. *State v. Langston*, No. W2015-02359-CCA-R3-CD, 2017 WL 1968827, at *11 (Tenn. Crim. App. May 12, 2017) (citations omitted), *perm. app. denied* (Tenn. Sept. 22, 2017). Instead, a court must question "whether the witness's knowledge will substantially assist the jury in understanding the evidence or in determining a fact in issue." *Id.*

But it is also true that "[c]ausation in fact . . . is a matter of probability, not possibility." *State v. Young,* No. 01C01-9605-CC-00208, 1998 WL 258466, at *22 (Tenn. Crim. App. May 22, 1998) (citing *Kilpatrick v. Bryant*, 868 S.W.2d 594, 602 (Tenn. 1993)). This court has cautioned that "[e]xpert testimony that a certain thing is possible is no evidence at all, and speculation by an expert is no more valid than the jury's own speculation as to what is or what is not possible." *Id.* (citing *Lindsey v. Miami Development Corp.*, 689 S.W.2d 856, 862 (Tenn. 1985)).

The Defendant argues that Dr. Strange should have been permitted to testify that a "false memory" exists in this case or that the forensic interview distorted the victim's testimony. However, while Dr. Strange testified generally about how memories could be distorted, she admitted that she could not offer an opinion specifically about whether the victim's memory was false or distorted.

For example, during the pretrial hearing, Dr. Strange was asked directly if the interview would have caused the victim's memory to be distorted. Dr. Strange responded, "I can't say for sure, but I would be highly surprised if it didn't." Later at trial, she identified *why* she could not offer an opinion on this point: she lacked the factual foundation from which to draw an opinion. Dr. Strange testified that "we can never say how much suggestion there was" from the interview itself because the interview was not fully recorded and because the police had already interviewed the victim. This limitation was also expressed in her expert report, which stated that "it is impossible to judge the degree of suggestion" in the interview.

The trial court certainly did not err in excluding an opinion that the Defendant's expert believed was "impossible" to offer. Nevertheless, the Defendant argues that the trial court improperly excluded this opinion simply because it could not be offered "within a reasonable degree of certainty within her field of expertise." We respectfully disagree.

At trial, the court clarified that it excluded this testimony because an opinion about what "could have been" is irrelevant. It also noted that the expert did not find "a distorted memory in this case based on the evidence." These were relevant considerations in assessing the reliability of Dr. Strange's opinion about whether the victim's actual memory was false or distorted. Indeed, our supreme court has required trial courts to assess "the connection between an expert's conclusions and the underlying data upon which those conclusions are based" as part of its gatekeeping functions. *State v. Scott*, 275 S.W.3d 395, 402–03 (Tenn. 2009). In this light, the trial court's decision to exclude Dr. Strange's opinion was based upon her inability to offer a reliable opinion on that point, not because she failed to incant the "magic words" of scientific certainty.

However, even if the trial court erred in requiring the expert to opine with scientific certainty—and it did not impose such a requirement—the error was clearly harmless. *See Rimmer*, 623 S.W.3d at 287 (holding that an error in excluding expert testimony is subject to harmless error analysis). At trial, Dr. Strange testified about the factors that could contribute to distorted memory, both generally and in the context of a forensic examination. She also opined that there were "significant sources of suggestion" in the victim's interview and that "there were numerous suggestive influences present in this case." Through this testimony, the Defendant placed before the jury all that his expert could reliably offer. As such, the Defendant has not shown that the trial court's decision to exclude unreliable testimony "more probably than not affected the judgment" or "result[ed] in prejudice to the judicial process." Tenn. R. App. P. 36(b); *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008). The Defendant is not entitled to relief on this issue.

## F.    JURY INSTRUCTIONS

The Defendant next argues that the trial court erred by improperly instructing the jury after being informed the jury was deadlocked. As background for this issue, the trial court was notified during deliberations that the jury was "at an impasse." The court called the jury into the courtroom and confirmed that the jury was deadlocked. At that point, the trial court stated:

> You're going to get mad at me, but I'm not going to let you quit just yet. I want you to [go] back, and I want you to work a little bit further. And I'm going to ask that maybe you try something different, and that may be something like suggesting that one person who has been advocating one side is then called upon to advocate the opposite side. Same thing with the other side.

> The reason I'm suggesting doing that is it makes you look at it from a different perspective, especially if you're advocating it. And sometimes if

- 20 -

you can get everything out there, it's going to cause each and every one of you to look at this maybe through a different prism.

I don't know if you're going to reach a unanimous agreement, but I want you to at least try. And the reason that I'm making you do this, is this case took about three days to try. You've had it for a little over two hours. I want you to work just a little bit more at this and let's see where we are.

If you just simply cannot come to a unanimous agreement, that happens sometimes. I understand that, but I want to work a little bit further on it. Let's see where we are. If we need to address this again in an hour or so from now, we'll address it again, okay? All right. Go back and work a little bit more.

The Defendant did not raise any objection to the trial court's supplemental instruction until moments before the jury read its verdict in open court.

On appeal, the Defendant asserts that the trial court gave an unlawful "dynamite charge" to encourage "deadlocked dissenting jurors to consider alternate viewpoints to reach a unanimous verdict." *See Allen v. United States*, 164 U.S. 492 (1896); *Simmons v. State*, 281 S.W.2d 487 (Tenn. 1955). The State responds that the trial court's instruction was lawful. We agree with the State.

"Whether jury instructions are sufficient is a question of law appellate courts review de novo with no presumption of correctness." *State v. Clark*, 452 S.W.3d 268, 295 (Tenn. 2014). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005).

Our supreme court has held that if a jury has reported it is deadlocked and "the trial judge feels that further deliberations might be productive, [the judge] may give supplemental instructions[.]" *Kersey v. State*, 525 S.W.2d 139, 141 (Tenn. 1975). However, these supplemental instructions cannot effectively coerce jurors "into surrendering views conscientiously entertained," such as by imploring the dissenting jurors to "listen to the views of the majority with the disposition of being convinced." *Id.* at 144. The supplemental instruction also may not require a dissenting juror to "consider whether his [or her] doubt was a reasonable one which made no impression on the minds of so many other [jurors], equally honest, and equally intelligent with [themselves]." *Id.* Instead, the supreme court held that the following instruction would be proper to give to a deadlocked jury:

The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

*Id.* at 145.

In this case, the better practice would have been to give the *Kersey* instruction rather than an alternative. *Kersey*, 525 S.W.2d at 145 ("Strict adherence is expected[,] and variations will not be permissible."). That said, nothing about the trial court's instruction was fashioned to coerce jurors with dissenting views. The instruction urged jurors to reconsider their views, true, but the instruction applied to all jurors. It was not directed to jurors with dissenting views, and it did not urge dissenting jurors to "reevaluate or to cede" their views to those of the majority. *See State v. Baxter*, 938 S.W.2d 697, 704 (Tenn. Crim. App. 1996) ("[T]he court, in effect, ordered the jury to continue deliberating. It did not direct any of its comments to jurors in the minority, nor did it urge such jurors to reevaluate or to cede his or her views to those of the majority."). In this way, the instruction encouraged all jurors to do only as *Kersey* instructs: "In the course of your deliberations, do not hesitate to reexamine your own views and change your opinion if convinced it is erroneous." *Kersey*, 525 S.W.2d at 145.

Moreover, the trial court did not act to compel a verdict. The trial court recognized the possibility that the jury may not reach a unanimous verdict, and it removed the pressure to do so by expressly acknowledging that juries sometimes "simply cannot come to a unanimous agreement." The court also offered to revisit the issue "[if] we need to," making clear that it was open to additional discussion on the point.

"[T]he primary concern expressed by courts in rejecting the dynamite charge is that it may impair the right to a unanimous verdict by coercing jurors holding the minority view in deliberations to surrender their beliefs and follow the majority." *In re Est. of Link*, 542 S.W.3d 438, 466 (Tenn. Ct. App. 2017). There was no such risk here. Accordingly, we conclude that the Defendant is not entitled to relief.

## G. SENTENCING

On appeal, the Defendant contends that the trial court misapplied enhancement factors and disregarded mitigating factors in arriving at his effective twenty-five-year sentence. He asserts that the correct sentences would have been at the bottom of the range. The State concedes that the trial court incorrectly sentenced the Defendant but maintains it did so by failing to apply the sentencing law in effect when the offenses were committed and by violating *Blakely v. Washington*, 542 U.S. 296 (2004). We agree with the State.

Although the Defendant was tried in 2021, the events giving rise to this case occurred in 1992. The Defendant did not file a waiver seeking to be sentenced under the 2005 amendments to the 1989 Sentencing Reform Act. As such, all parties agree that the Defendant should be sentenced pursuant to the 1989 Sentencing Act in effect at the time of his offenses. *See State v. Smith*, 893 S.W.2d 908, 919 (Tenn. 1994); *State v. Vantilburg*, No. W2006-02475-CCA-R3-CD, 2008 WL 382765, at *9 (Tenn. Crim. App. Feb. 12, 2008) ("Had the defendant desired sentencing under the 2005 amendment to the Sentencing Act, he could have executed a waiver of his ex post facto protections. No waiver appears in the record; thus, the sentence in this case was governed by the pre-2005 amendments." (citations omitted)), *perm. app. denied* (Tenn. Aug. 25, 2008).

Both parties request that this case be remanded for a new sentencing hearing pursuant to the pre-2005 Sentencing Act. Under the pre-2005 Sentencing Act, "[t]he presumptive sentence shall be the minimum sentence in the range if there are no enhancement or mitigating factors." Tenn. Code Ann. § 40-35-401(d) (1990 Repl.). If there are enhancement factors but no mitigating factors, "the court may set the sentence above the minimum in that range but still within the range." *Id.* § 40-35-401(d). If there are "enhancement and mitigating factors, the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors." *Id.* § 40-35-401(e).

Under the law in effect when the offenses were committed, the presumptive sentences for a Class A felony and for a Class B felony were the minimum sentences in the respective ranges. *See* Tenn. Code Ann. § 40-35-210(c) (1990 Repl.); *State v. McClellan*, No. E2010-02338-CCA-R3-CD, 2012 WL 2356487, at *5 (Tenn. Crim. App. June 21, 2012) ("Prior to an amendment in 1995, Tennessee Code Annotated section 40-35-210 provided the presumptive sentence for a Class A felony as the minimum within the range or fifteen years."), *perm. app. denied* (Tenn. Nov. 27, 2012). For a Range I offender convicted of a Class A felony, the range was not less than fifteen years nor more than twenty-five years. *Id.* § 40-35-112(a)(1). For a Range I offender convicted of a Class B felony, the range was not less than eight years nor more than twelve years. *Id.* § 40-35-

112(a)(2). Therefore, in the absence of any enhancement factors, the presumptive sentences—in fact, the only available sentences—were fifteen years for the Defendant's aggravated rape conviction and eight years for his aggravated sexual battery conviction.

In 2007, our supreme court reexamined these sentencing statutes in light of *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v. Washington*, 542 U.S. 296 (2004). In *State v. Gomez*, 239 S.W.3d 733, 740 (Tenn. 2007), our supreme court held that a trial judge could not enhance a sentence above the presumptive minimum sentence—or could not find and apply an enhancement factor—"based on judicially determined facts other than the fact of a prior conviction[.]" *Gomez*, 239 S.W.3d at 740. Although our sentencing statutes have since been amended to remove presumptive sentences and render enhancement factors merely advisory, *State v. Bise*, 380 S.W.3d 682, 699 (Tenn. 2012), all parties agree that the Defendant's sentence is governed by the law as it existed before these amendments.

In practical terms for this case, a trial court applying the law in effect at the time of the Defendant's offenses may not increase the Defendant's sentences above the presumptive minimums unless (1) at least one enhancement factor exists; and (2) the enhancement factor (i) consists solely of the Defendant's prior criminal convictions; (ii) is based on facts reflected in the jury's verdict; or (iii) is admitted by the Defendant. *See State v. Allen*, 259 S.W.3d 671, 685 (Tenn. 2008); *State v. Dorantes*, 331 S.W.3d 370, 391 (Tenn. 2011) ("Prior criminal history, however, is an enhancement factor that does not offend the Sixth Amendment absent submission of the issue to a jury."). Of course, a decision to impose consecutive sentences is not affected by *Apprendi* or *Blakely*. *See Allen*, 259 S.W.3d at 690; *State v. Pottebaum*, No. M2007-02108-CCA-R3-CD, 2008 WL 5397848, at *18 (Tenn. Crim. App. Dec. 30, 2008), *perm. app. denied* (Tenn. June 1, 2009).[1]

In this case, the trial court imposed a sentence for each conviction above the respective presumptive minimum sentences. It did so by finding facts to support various enhancement factors, including factors focused on the Defendant's prior criminal behavior, his desire for pleasure or excitement, and his breach of a private trust. *See* Tenn. Code Ann. § 40-35-114(1), (7), (15) (1990 Repl.). However, the Defendant did not admit any facts that would support applying any enhancement factor. And, although the trial court found that the Defendant had committed other criminal acts against the victim, it acknowledged that the Defendant otherwise had no history of criminal convictions.

---

[1] Because the trial court imposed the maximum sentences for each of the Defendant's convictions, it declined to align the sentences consecutively in that circumstance because it was "very comfortable" with the length of the appropriate sentence.

At oral argument, the State asserted that enhancement factors may exist that are based on facts reflected in the jury's verdict, and for this reason, it specifically requested a remand for a new sentencing hearing so that it may present these arguments. In response, the Defendant also requested a remand for resentencing as well. We agree that these arguments should be developed in the record and passed upon in the trial court. Accordingly, we reverse the sentences imposed and, at the parties' joint request, remand for resentencing on each conviction in compliance with *Blakely*. *See State v. Oliver*, No. M2008-01824-CCA-R3-CD, 2010 WL 681377, at *1 (Tenn. Crim. App. Feb. 26, 2010) (remanding for resentencing in light of *Blakely*), *no perm. app. filed*.

## CONCLUSION

In summary, we affirm the Defendant's convictions for aggravated rape and aggravated sexual battery. However, we respectfully vacate the Defendant's sentences and remand this case to the trial court for resentencing in compliance with *Blakely*.

_____

TOM GREENHOLTZ, JUDGE
